UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

VISION SERVICE PLAN,

           Plaintiff,

    v.

UNITED STATES OF AMERICA,

           Defendant.
_____/

NO. CIV. S-04-1993 LKK/JFM

O R D E R

In 1960, Vison Service Plan ("VSP") was granted status as a tax-exempt organization. In 1999, the IRS commenced an examination of VSP. The IRS concluded that VSP was not entitled tax-exempt status under Internal Revenue Code, 26 U.S.C., ("IRC"), Section 501(c)(4). Def.'s SUF, 1. The IRS issued a final adverse determination letter to VSP, revoking its IRC Section 501(c)(4) status, effective prospectively from January 1, 2003. Def.'s SUF, 2. The following year, VSP paid the tax owed on its 2003 earnings, and then filed this suit.

////

////

1

Pending before the court are cross-motions for summary judgment. VSP seeks a determination that it is a social welfare organization under 501(c)(4), a refund of its income tax payment for 2003 and an order that the United States issue it a private letter recognizing VSP's status under 501(c)(4). The United States seeks summary judgment on the grounds that VSP does not qualify for exemption under 501(c)(4).

## II.

### STANDARDS

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); See also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Sicor Limited v. Cetus Corp., 51 F.3d 848, 853 (9th Cir. 1995).

Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary

1 judgment should be entered, after adequate time for discovery and
2 upon motion, against a party who fails to make a showing sufficient
3 to establish the existence of an element essential to that party's
4 case, and on which that party will bear the burden of proof at
5 trial. See id. at 322. "[A] complete failure of proof concerning
6 an essential element of the nonmoving party's case necessarily
7 renders all other facts immaterial." Id. In such a circumstance,
8 summary judgment should be granted, "so long as whatever is before
9 the district court demonstrates that the standard for entry of
10 summary judgment, as set forth in Rule 56(c), is satisfied." Id.
11 at 323.

12     If the moving party meets its initial responsibility, the
13 burden then shifts to the opposing party to establish that a
14 genuine issue as to any material fact actually does exist.
15 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
16 586 (1986); See also First Nat'l Bank of Ariz. v. Cities Serv. Co.,
17 391 U.S. 253, 288-89 (1968); Sicor Limited, 51 F.3d at 853.

18     In attempting to establish the existence of this factual
19 dispute, the opposing party may not rely upon the denials of its
20 pleadings, but is required to tender evidence of specific facts in
21 the form of affidavits, and/or admissible discovery material, in
22 support of its contention that the dispute exists. Fed. R. Civ.
23 P. 56(e); Matsushita, 475 U.S. at 586 n.11; See also First Nat'l
24 Bank, 391 U.S. at 289; Rand v. Rowland, 154 F.3d 952, 954 (9th Cir.
25 1998). The opposing party must demonstrate that the fact in
26 contention is material, i.e., a fact that might affect the outcome

1  of the suit under the governing law, Anderson v. Liberty Lobby,
2  Inc., 477 U.S. 242, 248 (1986); Owens v. Local No. 169, Assoc. of
3  Western Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1992)
4  (quoting T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,
5  809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine,
6  i.e., the evidence is such that a reasonable jury could return a
7  verdict for the nonmoving party, Anderson, 477 U.S. 248-49; see
8  also Cline v. Industrial Maintenance Engineering & Contracting Co.,
9  200 F.3d 1223, 1228 (9th Cir. 1999).
10      In the endeavor to establish the existence of a factual
11 dispute, the opposing party need not establish a material issue of
12 fact conclusively in its favor.  It is sufficient that "the claimed
13 factual dispute be shown to require a jury or judge to , 04-
14 1993resolve the parties' differing versions of the truth at trial."
15 First Nat'l Bank, 391 U.S. at 290; See also T.W. Elec. Serv., 809
16 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce
17 the pleadings and to assess the proof in order to see whether there
18 is a genuine need for trial.'"   Matsushita, 475 U.S. at 587
19 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963
20 amendments); see also International Union of Bricklayers & Allied
21 Craftsman Local Union No. 20 v. Martin Jaska, Inc., 752 F.2d 1401,
22 1405 (9th Cir. 1985).
23      In resolving the summary judgment motion, the court examines
24 the pleadings, depositions, answers to interrogatories, and
25 admissions on file, together with the affidavits, if any.  Rule
26 56(c); See also In re Citric Acid Litigation, 191 F.3d 1090, 1093

1  (9th Cir. 1999).  The evidence of the opposing party is to be
2  believed, see Anderson, 477 U.S. at 255, and all reasonable
3  inferences that may be drawn from the facts placed before the court
4  must be drawn in favor of the opposing party, see Matsushita, 475
5  U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654,
6  655 (1962) (per curiam)).  Nevertheless, inferences are not drawn
7  out of the air, and it is the opposing party's obligation to
8  produce a factual predicate from which the inference may be drawn.
9  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45
10 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).
11      Finally, to demonstrate a genuine issue, the opposing party
12 "must do more than simply show that there is some metaphysical
13 doubt as to the material facts. . . . Where the record taken as a
14 whole could not lead a rational trier of fact to find for the
15 nonmoving party, there is no 'genuine issue for trial.'"
16 Matsushita, 475 U.S. at 587 (citation omitted).

### III.

### ANALYSIS

19      The issue to be resolved in the cross-motions is whether VSP
20 qualifies for tax exempt status under 26 U.S.C. § 501(c)(4).
21 Below, I explain why plaintiff's motion for summary judgment must
22 be denied and defendant's motion for summary judgment must be
23 granted.
24 ////
25 ////
26 ////

5

**A.   APPLICABLE LAW**[1]

A taxpayer seeking exemption from taxation has the burden of proving by clear and convincing proof that he is within a specific exemption clause. <u>Club Gaona, Inc. v. United States</u>, 167 F.Supp. 741, 746 (S.D. Cal. 1958).

Section 501(c)(4) of the Internal Revenue Code (26 U.S.C.A. § 501(c)(4)) provides federal tax exemption to a social welfare organization. Section 501 provides, in pertinent part, that "organizations not organized for profit but operated exclusively for the promotion of social welfare" shall be exempt from taxation. 26 U.S.C. §§ 501(a) and 501(c)(4)(A).

Although the words "exclusively" and "primarily" have different meanings, courts interpret the word "exclusively" to mean, "primarily." See <u>American Women Buyers Club, Inc. v. United States</u>, 338 F.2d 526, 528 (2nd Cir. 1964)("The word 'exclusively' as used in the statute has not been given a strict interpretation . . . but rather has been interpreted to mean 'primarily.'")(citing <u>Debs Memorial Radio Fund, Inc. v. Commissioner</u>, 148 F.2d 948, 952 (2nd Cir. 1945)).

In like fashion, the regulations provide:

> An organization is operated exclusively for the promotion of social welfare if it is primarily engaged in promoting in some way the common good and general welfare of the people of the community. An organization embraced within this section is one which is operated primarily

---

[1] Because resolution of these motions require a fact-intensive inquiry, the court will eschew a separate exposition of the facts. The facts discussed during the analysis section are undisputed, unless indicated otherwise.

6

for the purpose of bringing about civic betterments and social improvements.

26 C.F.R. § 1.501(c)(4)-1(a)(2).

The regulations go on to provide that an organization is not operated primarily for the promotion of social welfare if its primary activity is "carrying on a business with the general public in a manner similar to organizations which are operated for profit." 26 C.F.R. § 1.501(c)(4)-1(a)(2)(ii).

In essence, VSP must establish that it is (1) not organized for profit; and (2) that it operates primarily for the promotion of social welfare. 26 C.F.R. § 1.501(c)(4)-1(a)(I) & (ii). As I explain below, VSP is unable to demonstrate satisfaction of either of the two requisite criteria.[2]

**B.    THE PROMOTION OF SOCIAL WELFARE**

Plaintiff maintains that it qualifies for exemption under 501(c)(4) because "it is operated primarily for the promotion of social welfare." Pl.'s Mot. for Summ. J. at 2:20. VSP claims to serve broad segments of the community through direct services as well as through charity work. While VSP's charitable work is admirable, VSP cannot establish that it operates primarily for the promotion of social welfare within the meaning of the tax

---

[2] Defendant places great reliance of cases addressing qualification for tax exempt status under § 501(c)(3). That reliance is inapposite. Section 501(c)(3) and (c)(4) address different circumstances and have different criteria for exemption. Moreover, the three 503(c)(3) cases discussed by VSP are distinguishable as they involve actual health care providers or HMOs. As discussed in the text, plaintiff is not a health care provider.

regulations.

The Treasury regulation provides that:

> An organization embraced within this section is one which is operated primarily for the purpose of bringing about civic betterments and social improvements.

26 C.F.R. § 1.501(c)(4)-1(a)(2).

Thus, to qualify an organization must be "a community movement designed to accomplish community ends." Erie Endowment v. United States, 316 F.2d 151, 156 (3d Cir. 1962).

It is frequently the case that an organization is found not to qualify under 501(c)(4) because it is operating primarily for the benefit of its members, rather than for the purpose of benefitting the community as a whole. See, e.g., Contracting Plumbers Co-op. Restoration Corp. v. United States, 488 F.2d 684, 686 (2d Cir. 1973) (plumbers cooperative not tax exempt as benefits were proportional to member's financial involvement); American Women Buyers, 338 F.2d at 528 (association not tax exempt as majority of benefits were for members and did not promote social welfare). In sum, where organizations provide substantially different benefits to the public as compared to its private members, it is not "primarily" devoted to social welfare as required by Section 501(c)(4). Id. at 687. In essence, even though there may be aspects of the organization that greatly benefit society, if the majority of the organization's services benefit private members, the organization cannot qualify for an exemption under 501(c)(4). Moreover, it has also been held that "[t]he presence of a single substantial non-exempt purpose

8

precludes exempt status regardless of the number or importance of the exempt purpose." Contracting Plumbers, 588 F.2d at 686. Finally, it is pertinent to the instant case to note that the fact that an organization promotes health care, or is part of the health care industry, does not, alone, ensure exempt status within the tax code. See IHC Health Plans Inc. v. Commissioner of Internal Revenue, 325 F.3d 1188, 1197 (10th Cir. 2003).

The test for qualification under 501(c)(4) is stringent. For instance, in Commissioner of Internal Revenue v. Lake Forest, Inc., 305 F.2d 814 (4th Cir. 1962), the court found that a membership-based organization involved in providing housing for veterans did not qualify. The court explained:

> Lake Forest does, of course, furnish housing to a certain group of citizens but it does not do so on a community basis. It is a public-spirited but privately-devoted endeavor. Its work in part incidentally redounds to society but this is not the 'social welfare' of the tax statute.

C.I.R. v. Lake Forest, Inc., 305 F.2d at 818. The court further explained that classification as "'civic' or 'social' depends upon the character – as public or private – of the benefits bestowed, of the beneficiary, and of the benefactor." Id.

As applied to the case at bar, the court concludes that despite VSP's charity work, the membership-based structure as well as the types of services offered, demonstrate that VSP's primary activity is not the promotion of social welfare. I begin this part of the analysis with an examination of VSP's service structure.
////

9

1. **VSP's Clients**

Plaintiff argues that VSP serves a broad cross section of the California community. See Pl.'s Mot. for Summ. J. at 27:12-16. While this may be true, VSP's primary activity is to defray and assume "the costs of professional vision care by establishing a fund from periodic payments by subscribers or beneficiaries, from which fund said costs may be paid." Decl. of Jeremy N. Hendon, Ex. A, VSP's Articles of Incorporation, at Article II. VSP contracts with employers, health maintenance organizations, insurance companies, and political subdivisions ("subscribers") to arrange for the provision of vision care services and vision supplies to the subscribers' employees or members ("enrollees"). Def.'s SUF, 3.

VSP provides services to subscribers and through them, to enrollees. A non-enrolled individual may not simply walk in off the street to receive care. Def. SUF, 6. Although VSP does provide services through charity programs, these services to non-enrollees are not, comparatively, substantial. Much like the organizations at issue in Lake Forest or Contracting Plumbers Cooperative, the benefits that VSP provides to the public are incidental and not the primary purpose of VSP. VSP's primary purpose is to serve VSP's paying members.

VSP argues that there are several factors favoring a finding of tax exempt status. They note that (1) many of VSP's subscribers are small businesses, a consideration under the Internal Revenue Manual in evaluating tax exempt status, Pl.'s SUF 27; (2) many VSP

10

1  doctors serve areas designated as medically needy or under served.
2  Pl.'s SUF, 90-91.; (3) VSP provides vision care for many Medicaid
3  and Medicare participants; and (4) VSP services low income children
4  through the California Healthy Families Child Heath Assistance
5  Program ("Healthy Families"), Pl.'s SUF, 30.  The court now
6  addresses each of these contentions.

### a. Small Employers & Servicing Rural Areas

Servicing small employers or rural subscribers and enrollees does not equate to promoting social welfare. See Def. Opp'n at 24: 14-22.  Small employers or rural employers are still paying for VSP's services and VSP is making a profit from these contracts. VSP submits that the Internal Revenue Manual lists servicing smaller employers and rural enrollees as a factor in determining if an HMO qualifies for exemption under 501(c)(4).  See Pl.'s Mot. for Summ. J. 27:20-22.  This argument is unavailing.  Even assuming arguendo the binding character of the manual, a dubious proposition, VSP is not an HMO, i.e. it does not provide medical services, it is instead what is known in the trade as a bundler.[3]

### b. Medicaid, Medicare and Healthy Families enrollees

VSP argues that servicing Medicaid, Medicare and Healthy Families participants is a central part of how VSP promotes social welfare.

////

---

[3] There is nothing pejorative in the term, it simply notes a functional difference between providers, and an organization that arranges for the provision of services.

11

In 2003, VSP covered more than 2.1 million Medicaid and Medicare participants for vision care. These enrollees comprised 31.4% of VSP's total enrollment. Pl.'s SUF, 29. Combined with the children VSP served through Heathy Families, these three groups of enrollees represented 41.5% of VSP's total enrollment in 2003. VSP submits that it suffered substantial losses from providing services to Medicaid, Medicare and Healthy Families participants. See Pl.'s SUF, 35. VSP argues that these facts support a finding that VSP is primarily engaged in promoting social welfare. The court cannot agree.

First, VSP competitively bid for the Medicaid, Medicare and Healthy Families contracts. See Def.'s Mot. for Summ. J., Hendon Dec., Ex. H at 137-41. As defendant notes:

> The criterion for an Enrollee to receive VSP's services is not whether such person is a member of a medically underserved population. Rather, the criterion is whether the Enrollee is an employee or member of a paying Subscriber (e.g., the State of California) which contracts with VSP for a fee. That is, VSP does not focus on individuals who need medical care, but focuses on its Subscribers with whom VSP contracts for a fee.

Def. Mot. for Summ. J. at 11:15-19.

Second, in calculating the alleged losses, VSP includes discounts given by participant doctors. This does not appear appropriate. As the court understands it, the providing doctor incurs the loss and not VSP.[4] Therefore, the court does not accept

---

[4] Defendant's example is helpful in understanding how it is that VSP does not absorb the loss:

> For example, suppose the customary doctor fee was $100

12

as accurate the alleged "losses" as calculated by plaintiff. See Pl. Mot. for Summ. J., Cochran Dec., Ex. K.

Third, from all that appears, the Medicaid, Medicare and Healthy Families programs are profitable for VSP. As defendant maintains, if VSP refused to reduce its fees for these contracts, "VSP would lose a substantial volume of business, albeit at reduced fees." Def.'s Opp'n to Pl. Mot. for Summ. J. at 27:23-26.

Fourth, VSP claims that in 2003, excluding doctor discounts, VSP spent $4,296,055.00 on discounts and underwritten losses for Medicare, Medicaid and Healthy Families participants. Pl's. Mot. for Summ. J., Cochran Dec. Ex. N. Even if the court accepts VSP's numbers as accurate, this expenditure of $4,296,055.00 is a relatively small fraction of VSP's net income for 2003, which was $34,487,626.00, id., and an even smaller fraction of VSP's gross income for 2003, which was $425 million. Def.'s Mot. for Summ. J., Hendon Dec., Ex. K.

Even if the court concluded that servicing these specific enrollees could constitute promoting social welfare, these enrollees make up less than half of VSP's total enrollment, thus

---

> per patient and the reduced doctor fee for Subscribers with Medicare enrolles was $75 per patient; VSP does not suffer a $25 loss because, while it receives $75 per patient from the Subscriber, it is required to pay the doctor provider only $75 per patient, not $100. Thus, there is no net "loss" to VSP. The doctor is the only participant who arguably suffers a "loss."

Def. Opp'n at 27:15-19.
    Moreover, even there the "loss" suffered by the provider is only as compared to his usual fee.

13

again negating a conclusion that VSP is "primarily engaged" (much less exclusively engaged) in promoting social welfare.

While VSP does in fact offer services to these groups, it is also very clear that servicing these particular enrolles is not VSP's primary activity. Put directly, VSP is operating primarily for the benefit of its subscribers rather than for the purpose of benefitting the community as a whole. This conclusion precludes VSP from exemption under 501(c)(4). See, e.g., Contracting Plumbers, 488 F.2d at 686; American Women Buyers Club, 338 F.2d at 528.

### 2. VSP's Charity Services

Plaintiff maintains that VSP provides free vision care to "substantial numbers of non-enrollees under VSP's charity programs." Pl.'s SUF, 23. It is true that VSP provides vision care services to non-enrollees. Nonetheless, the provision of these services is comparatively small, and again, does not establish that VSP is primarily engaged in promoting social welfare.

There are two main programs through which non-enrollees might receive vision care services: the Sight for Students program and disaster relief efforts.

#### a. Sight for Students

This program targets children of families earning up to 200% of the poverty level and who do not participate in other eyecare insurance programs. VSP's free services under the program include eye examinations, eyeglasses, medically-necessary contact lenses,

14

1 vision therapy and low vision treatment.  These services are
2 available for students up to age 18 or through graduation from high
3 school.  Pl.'s SUF, 37.  The Sight for Students children and their
4 families select a VSP doctor and present a VSP service
5 authorization (voucher).  The VSP doctor then provides services and
6 is paid standard VSP contract rates by VSP or a local VSP
7 affiliate.  VSP or an affiliate bears the cost of the providers'
8 services and of the glasses or contacts provided under the plan.
9 Pl.'s SUF, 39.
10      In 2003, VSP spent $2.8 million dollars on this program, Pl.'s
11 Mot. for Summ. J., Cochran Dec., Ex. N, and provided services for
12 12,558 children.  Id., Ex. H.  When one compares $2.8 million,
13 however, with VSP's net or gross income, it appears that the amount
14 spent on this program is not substantial.  Indeed, children
15 receiving care under the Sight for Students program constituted
16 only .19% of VSP's total enrollment.  Taken together, these facts
17 support a finding that VSP is not primarily engaged in the
18 promotion of social welfare.
19           **b.   Disaster Relief Services**
20      In conjunction with the American Red Cross, VSP also
21 contributes to disaster relief by providing free exams and
22 replacement glasses to disaster victims.  VSP provides vouchers to
23 chapters of the American Red Cross for free services.  Disaster
24 victims may present these authorizations to VSP providers to
25 receive free examinations and glasses, for which VSP reimburses the
26 providers.  Pl.'s SUF, 41.

1  In 2003, VSP provided services for 285 people compared to a
2  total enrollment of 6 million, Pl.'s Mot. for Summ. J., Cochran
3  Dec., Ex. H, and spent roughly $73,132.00.  Id.  Again, compared
4  to either VSP's net income or gross income, the amount spent on
5  disaster relief services is minimal.

### 3. VSP's Community Outreach and Community Education

In addition to providing services to non-enrollees, VSP also engages in educational and community outreach.  These programs include: (1) Get Focused Campaign; (2) Health Care Vision Project; (3) Vision USA; (4) Eye on Health Patient Newsletter; (5) Optometric Education and Research; (6) Clinical Guidelines and Algorithms; and (7) Paid Time Off for Volunteer Service.  See Pl.'s Mot. for Summ. J. at 34-36.  VSP claims that these programs, in conjunction with the services provided to Medicaid, Medicare and Health Families participants, support a finding that it is primarily engaged in the promotion of social welfare.  The court cannot agree.

While these programs are admirable and important, they do not demonstrate VSP being primarily involved in the promotion of social welfare.  In 2003, VSP spent $3,893,496.00 on these programs.  See Pl.'s Mot. for Summ. J., Cochran Dec., Ex N.  This includes the Sight for Students Program, as well as disaster relief services.  Again, this is a very small fraction of VSP's gross or net income for 2003.

Plaintiff submits that, taken together, VSP's charity work and service to Medicaid, Medicare and Healthy Families participants

16

demonstrates that VSP should be exempt under the requirements of 501(c)(4). VSP's own numbers do not support such a conclusion.

In 2003, VSP spent roughly 8 million dollars on charity work. See Pl.'d Mot. for Summ. J., Cochran Decl., Ex. N. This number does not include doctor discounts, but does include the costs that VSP allegedly incurred providing services to Medicaid, Medicare and Healthy Families participants.

Even assuming that VPS's calculations are accurate, eight million dollars is 24% of VSP's 2003 net income and an even smaller percentage of VSP's gross income. In sum, these programs and services do not demonstrate that VSP is primarily engaged in the promotion of social welfare. While VSP does contribute to the betterment of society, like the organization in Lake Forest, it is a "publicly spirited but privately-devoted endeavor." Lake Forest, 305 F.2d at 818. VSP's work "incidentally redounds to society but this is not the 'social welfare' of the tax statute." Id.

Put directly, the court must conclude that VSP's services are most beneficial to private paying members, the subscribers and the enrollees. Like the members of the plumbers cooperation in Contracting Plumbers, members of VSP enjoy the benefit of VSP's services precisely to the extent that members use and pay for the services. Contracting Plumbers, 488 F.2d at 687. Serving the interests of these private subscribers is clearly a non-exempt purpose. Id. This non-exempt purpose destroys VSP's exemption status, regardless of the number or importance of truly exempt purposes. Id; American Women Buying Club, 338 F.2d at 528.

17

**C.   NOT OPERATING FOR PROFIT**

Plaintiff submits that VSP was organized as a non-profit and operates like one. VSP points to its by-laws, which provides in pertinent part:

> This Corporation shall operate as a nonprofit corporation and shall be organized and operated exclusively for the promotion of social welfare within the meaning of Section 501(c)(4) of the Internal Revenue Code of 1986, as amended, or any successor provision. The Corporation shall maintain and operate a voluntary nonprofit vision care plan to provide care to subscribers to such plan under contracts which entitle the subscribers to certain eye care; to provide eye care to medically underserved persons, whether or not subscribers to such plan; to provide public education regarding vision and vision care; to perform such services in a manner that benefits the community; and to engage in any and all lawful activities necessary and incidental thereto.

Pl.'s SUF, 3.

The issue, however, is not whether plaintiff is a nonprofit corporation for corporation law purposes, but whether it is one for federal tax purposes.

To qualify for an exemption under 501(c)(4), an organization must establish that it operates exclusively for the promotion of social welfare. According to the Treasury regulations, an organization is not operated primarily for the promotion of social welfare if its primary activity is "carrying on a business with the general public in a manner similar to organizations which are operated for profit." 26 C.F.R. § 1.501(c)(4)-1(a)(2)(ii). Moreover, a corporation that devotes much of its revenues to improving its ability to compete commercially through accumulation of large surpluses and expansion of its income producing facilities

18

is not entitled to exemption under Section 501(c)(4). <u>People's Educational Camp Soc. Inc. v. C.I.R.</u>, 331 F.2d 923, 932 (2d Cir. 1964).

In this regard, I begin by noting that VSP engages in cost-cutting measures common to for-profit businesses. For example, a portion of VSP's bonus structure paid to its employees is directly tied to reducing VSP's costs. Def.'s SUF, 24. <u>See</u> <u>also</u> Def.'s SUF, 25 and 26. (discussing other ways that VSP cuts costs).

Second, VSP strives to remain competitive in ways that do not appear to be consistent with the operations of a non-profit. For example, VSP pays commissions to brokers who bring new clients. In 2003, VSP paid $19 million in broker commissions. (This is more than VSP spent on charity work in 2003, Pl.'s Mot. for Summ. J., Cochran Dec., Ex. N). The broker's commission is calculated based on the revenue that VSP receives from each new client. Def.'s SUF, 29. <u>See</u> <u>also</u> Def.'s SUF, 30-31.

Moreover, the court is unable to agree with plaintiff that no one profits from its activities. Although VSP's by-laws provide that VSP has no equity owners who are entitled to share in its net earnings, in fact VSP executives and officers receive bonuses that are taken directly from the net earnings. <u>See</u> Def.'s Resp. to Pl.'s SUF, 4 (discussing VSP executive bonuses and how bonuses are calculated). Furthermore, VSP offers its executives high salaries and other forms of compensation that are more consistent with a for-profit corporation than an non-profit. For example, Roger Valine, the Chief Executive Officer of VSP, although not required

19

to work full time, was paid a $395,000 base salary for 2003, in addition to a sizable bonus plan. Def.'s SUF, 37 & 44. Chief officers and executives are also provided with luxury company cars. See Def.'s SUF, 47-49. VSP specifically targeted the executives' salaries to median market levels, making no distinction between salaries paid to executives working at for-profit businesses, and executives working at non-profit entities. Def.'s SUF, 38. See also Def.'s SUF, 40-41;47-49 (describes other ways that executives are compensated).

The court concludes that VSP carries on business with the public "in a manner similar to organizations which are operated for profit." 26 C.F.R. § 1.501(c)(4)-1(a)(2)(ii). Therefore, VSP does not operate primarily for the promotion of social welfare.

**D.  CONCLUSION**

Plaintiff has failed to establish that it qualifies for exempt status under 501(c)(4). VSP is not operated "exclusively for the promotion of social welfare" as provided for in 501(c)(4). For these reasons, summary judgment for the defendant, United States, is GRANTED. Summary judgment for the plaintiff, VSP, is DENIED. The Clerk is directed to ENTER judgment accordingly and CLOSE the case.

IT IS SO ORDERED.

DATED: December 12, 2005.

/s/Lawrence K. Karlton
LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT